# IN THE SUPREME COURT, STATE OF WYOMING

## 2023 WY 76

### APRIL TERM, A.D. 2023

### July 31, 2023

JOHN BYRON MILLS,

Appellant
(Defendant),

v.

S-22-0156

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Campbell County*
The Honorable James Michael Causey, Judge

*Representing Appellant:*
Joanne S. Zook, Steiner, Fournier and Zook, LLC, Cheyenne, Wyoming.

*Representing Appellee:*
Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General; Kristine D. Rude, Assistant Attorney General. Argument by Ms. Rude.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]    John Byron Mills was convicted by a jury of ten sex crimes against two sisters, A.S. and T.S.  He claims the State suppressed potentially exculpatory evidence, his trial counsel was ineffective, and the State did not present sufficient evidence to support his convictions for sexually assaulting T.S.  We affirm.

## ISSUES

[¶2]    We restate and reorder Mr. Mills' issues as:

1.    Did the State suppress potentially exculpatory evidence in violation of Mr. Mills' right to due process of law?

2.    Did Mr. Mills' defense counsel provide ineffective assistance?

3.    Did the State present sufficient evidence showing Mr. Mills committed three counts of first-degree sexual assault against T.S.?

## FACTS

[¶3]    Mr. Mills became acquainted with A.S. (D.O.B. 1998) and T.S. (D.O.B. 1996) because one of Mr. Mills' friends dated the victims' mother.  In 2013, when A.S. was 14 or 15 years old, she and her family were staying at a motel in Gillette.  Mr. Mills, who was also staying at the motel, walked into A.S.'s motel room while she was getting ready to go swimming, removed her clothes, and had sexual intercourse with her.

[¶4]    In 2014, when A.S. was 15 or 16 years old, Mr. Mills contacted her through Facebook and arranged to meet her in the Gillette Walmart parking lot.  He picked her up from the parking lot and drove to a car wash.  On the ride there, he fondled her breasts and put his hand down her pants to digitally penetrate her vagina.  After parking in a closed carwash bay, he removed her clothes and had sexual intercourse with her.  Later that year, Mr. Mills contacted A.S. through Facebook or text message and arranged another meeting.  This time, he picked her up from her father's house in Moorcroft and took her to his house in Gillette to drink alcohol and watch Netflix.  While there, he fondled her breasts, performed cunnilingus on her, and had sexual intercourse with her.

[¶5]    In September 2015, Mr. Mills contacted T.S. through Facebook and they agreed to meet at the Shell Food Mart in Gillette.  From the Shell parking lot, they drove around Gillette in Mr. Mill's white truck for a few hours.  Upon returning to the Shell, Mr. Mills asked T.S. to have sex with him.  When she refused, he held her down in the corner of the truck cab, pulled her pants down, and performed various sexual acts on her, including cunnilingus, digital penetration of her vagina, and intercourse.

1

[¶6]   The State charged Mr. Mills with a total of twenty-two crimes against A.S. and T.S. The jury convicted him of ten of the charges, including three counts of first-degree sexual assault against T.S. for the incident at the Shell Food Mart, five counts of third-degree sexual abuse of a minor against A.S. for the incidents at the motel, car wash, and his house, and two counts of sexual battery for fondling A.S.'s breasts.  After the district court sentenced Mr. Mills to 71 to 85 years in prison, he filed a timely notice of appeal.  We will provide additional facts, as necessary, in our discussion of the issues below.

## DISCUSSION

### A.    *Due Process – Suppression of Exculpatory Evidence*

[¶7]   Mr. Mills claims the State violated his due process rights by failing to produce exculpatory evidence to the defense in accordance with *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).  We review the question of whether the State violated Mr. Mills' constitutional rights *de novo. Kovach v. State,* 2013 WY 46, ¶ 19, 299 P.3d 97, 104 (Wyo. 2013) (citing *Lawson v. State,* 2010 WY 145, ¶ 19, 242 P.3d 993, 1000 (Wyo. 2010), and *Hicks v. State,* 2008 WY 83, ¶ 30, 187 P.3d 877, 883 (Wyo. 2008)).

[¶8]   In *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196-97, the United States Supreme Court ruled due process requires the State to disclose potentially exculpatory evidence within its control to the defense.  *Curby v. State,* 2018 WY 117, ¶ 9, 428 P.3d 444, 447 (Wyo. 2018); *Davis v. State*, 2017 WY 147, ¶ 18, 406 P.3d 1233, 1237 (Wyo. 2017).  The *Brady* rule places "an affirmative duty on the prosecutor to learn of favorable evidence in the State's control and divulge such evidence to the defendant." *Lawson,* ¶ 21, 242 P.3d at 1000*.*  This rule "ensure[s] that a miscarriage of justice does not occur." *United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985).

[¶9]   In *Giglio,* the Supreme Court extended the *Brady* disclosure requirement to evidence which would undermine the reliability of a witness on a matter important to the defendant's guilt or innocence, i.e., impeachment evidence. *Id.,* 405 U.S. at 154, 92 S.Ct. at 766. *See also, Bagley,* 473 U.S. at 676, 105 S.Ct. at 3380 ("[i]mpeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule"); *Chauncey v. State,* 2006 WY 18, ¶ 13, 127 P.3d 18, 21-22 (Wyo. 2006) (recognizing *Giglio's* extension of *Brady*); *Davis v. State,* 2002 WY 88, ¶ 18, 47 P.3d 981, 986 (Wyo. 2002) (it is well-established that "[f]avorable evidence includes impeachment evidence") (citations and quotation marks omitted).  To establish a *Brady* violation, the defendant must prove the State "suppressed evidence, the evidence was favorable to the defense, and the evidence was material because it is reasonably probable that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Pearson v. State,* 2017 WY 19, ¶ 36, 389 P.3d 794, 801-02 (Wyo. 2017) (citing *Worley v. State,* 2017 WY 3, ¶ 14,

2

386 P.3d 765, 770 (Wyo. 2017)).  Because *Giglio* simply extended *Brady,* we analyze a claim that the State suppressed impeachment evidence by using the *Brady* test.  *See United States v. Card,* 46 F.App'x 941, 947 (10th Cir. 2002) ("To establish a violation under *Brady* and *Giglio,* the defendant must demonstrate '(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material.'" (quoting *United States v. Combs,* 267 F.3d 1167, 1172 (10th Cir. 2001))).

[¶10]   Mr. Mills was convicted under Wyo. Stat. Ann. § 6-2-316(a)(iv) (LexisNexis 2021) of five counts of third-degree sexual abuse of a minor, A.S.  That provision prohibits an "actor" who is 17 "years of age or older" from "knowingly tak[ing] immodest, immoral or indecent liberties with a victim who is less than seventeen (17) years of age and . . . at least four (4) years younger than the actor." *Id.*  Mr. Mills claims the State suppressed evidence which would have exonerated him of third-degree sexual abuse of a minor by showing he did not have sexual contact with A.S. until she was over 17 years old.  He argues that, although law enforcement was aware he and A.S. had communicated via Facebook and text message, it failed to secure the messages and provide them to him in discovery.  He claims those messages would have "likely established a timeline different than [the timeline] the State presented to convict [him] of sexual abuse of a minor."  Mr. Mills also claims messages between him and each victim would have undermined the victims' credibility.

[¶11]   To satisfy the first element of a *Brady* violation, the defendant must show the State suppressed potentially exculpatory evidence.  "Before a *Brady* violation occurs, the government, through the prosecutor or its agents, must have 'suppressed' the information by not disclosing it to the defendant." *Dockter v. State,* 2019 WY 31, ¶ 18, 436 P.3d 890, 895 (Wyo. 2019) (citing *Kyles v. Whitley,* 514 U.S. 419, 437-38, 115 S.Ct. 1551, 1567-68, 131 L.Ed.2d 490 (1995)).  "The essence of *Brady* is the discovery of information after the trial, which was known to the prosecution but unknown to the defense during the trial." *Thomas v. State,* 2006 WY 34, ¶ 16, 131 P.3d 348, 353 (Wyo. 2006) (citing *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976)) (emphasis omitted).

[¶12]   Mr. Mills was a party to the messages he claims would have been favorable to his defense.  The State does not suppress evidence in violation of *Brady* if "'the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence.'" *Raley v. Ylst,* 470 F.3d 792, 804 (9th Cir. 2006) (quoting *United States v. Brown,* 582 F.2d 197, 200 (2d Cir. 1978)).  In other words, "[e]vidence is not suppressed within the meaning of *Brady* if it is . . . known and available to the defense prior to trial." *Hooks v. Workman,* 689 F.3d 1148, 1179-80 (10th Cir. 2012) (citation omitted).

[¶13]   In *Byerly v. State,* 2019 WY 130, ¶ 57, 455 P.3d 232, 248 (Wyo. 2019), the defendant claimed the State should have produced text messages between him and the victim.  We rejected his claim in part because we "fail[ed] to see how" the text messages

3

"could have been unknown and a surprise to Mr. Byerly since he was a party to them." *Id. See also, Kovach,* ¶¶ 40-43, 299 P.3d at 110-11 (the State did not suppress evidence of a witness's statement by failing to provide the defense a recording or transcript of law enforcement's interview of the witness because the defense had the same information from its own interview of the witness). The same is true here. Because Mr. Mills knew about the Facebook and text communications between him and the victims prior to the trial, the State did not suppress the messages in violation of due process under *Brady.*

[¶14] Furthermore, Mr. Mills makes no showing the Facebook or text messages contained evidence favorable to him or material to his guilt. To establish a *Brady* violation, the defendant has the "burden of proving that he was denied constitutionally material evidence and of providing evidence supporting such a claim." *Mascarenas v. State,* 2003 WY 124, ¶ 18, 76 P.3d 1258, 1265 (Wyo. 2003). In appealing his conviction for felony interference with a peace officer, Mr. Mascarenas claimed the State failed to produce to the defense a hospital record showing the nature of the officer's bodily injury. *Id.,* ¶ 16, 76 P.3d at 1265. We concluded

> [his] argument must fail because there is no indication in the [court] record that the evidence allegedly contained in the medical records was either favorable or material. [Mr.] Mascarenas did not make the medical records part of the [court] record nor did he move for a new trial before the district court. Without the benefit of a hearing or the presence of the alleged exculpatory evidence in the [court] record, we can only speculate as to what the [medical] records contained. In short, [Mr.] Mascarenas has completely failed to carry his burden of demonstrating that he was denied constitutionally material evidence . . . .

*Id.*

[¶15] Mr. Mills claims the Facebook and text messages between him and A.S. "likely" would have "established a timeline different than [the timeline] the State presented to convict [him] of sexual abuse of a minor" and given him "the tools to effectively cross examine witnesses" at trial. However, Mr. Mills did not raise any issue regarding the State's failure to provide the Facebook or text messages with the district court, so we have no evidence of the exculpatory "timeline" he refers to or the contents of the messages to determine their relevance for cross examination. We do not "rely on speculation in reviewing a *Brady* claim." *Worley*, ¶ 15, 386 P.3d at 770. Because Mr. Mills has failed to show the Facebook or text messages were favorable to him or material to his guilt, he has not established the State violated his right to due process of law under *Brady* or *Giglio* by failing to secure and produce them.

4

[¶16]   Finally, Mr. Mills asserts the State committed a *Brady* violation because it failed to produce the Facebook messages after representing at a pretrial conference that it would provide them.  Mr. Mills' argument does not allege a *Brady* violation because it does not pertain to the State's failure to disclose exculpatory evidence which was unknown to Mr. Mills.  Instead, it relates to a potential discovery dispute, which was never raised in the district court.  *See generally, Willoughby v. State,* 2011 WY 92, ¶ 46, 253 P.3d 157, 173 (Wyo. 2011) (addressing the prosecutor's failure to comply with a discovery order), and *State v. Naple,* 2006 WY 125, ¶¶ 8-13, 143 P.3d 358, 360-63 (Wyo. 2006) (discussing the State's discovery obligations).  We generally refuse to consider issues not raised in the district court.  *Harrison v. State,* 2021 WY 40, ¶ 15, 482 P.3d 353, 358 (Wyo. 2021).  Consequently, we will not address whether the record supports Mr. Mills' claim that the prosecutor promised to provide the information or whether the State violated its discovery obligations by failing to do so.

## B.  *Ineffective Assistance of Counsel*

[¶17]   The Sixth Amendment to the United States Constitution and Article 1, § 10 of the Wyoming Constitution guarantee anyone accused of a crime effective assistance of trial counsel.  To demonstrate counsel was ineffective, the appellant must show trial counsel's performance was deficient and the deficient performance prejudiced his defense.  *Griggs v. State,* 2016 WY 16, ¶ 36, 367 P.3d 1108, 1124 (Wyo. 2016) (citing *Cooper v. State,* 2014 WY 36, ¶¶ 19-20, 319 P.3d 914, 920 (Wyo. 2014), and *Strickland v. Washington,* 466 U.S. 668, 690-91, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)) (other citation omitted).  If the appellant fails to make the required showing of either deficient performance or prejudice, he cannot establish defense counsel was ineffective.  *Weston v. State,* 2019 WY 113, ¶ 35, 451 P.3d 758, 768 (Wyo. 2019) (citing *Osborne v. State,* 2012 WY 123, ¶ 19, 285 P.3d 248, 252 (Wyo. 2012)).  "'Claims of ineffective assistance of counsel involve mixed questions of law and fact and are reviewed *de novo*.'"  *Weston,* ¶ 34, 451 P.3d at 768 (quoting *Hibsman v. State*, 2015 WY 122, ¶ 14, 355 P.3d 1240, 1244 (Wyo. 2015)) (other citation omitted).

[¶18]   "To prove deficient performance, the appellant must show 'counsel failed to render such assistance as would have been offered by a reasonably competent attorney.'"  *Weston,* ¶ 36, 451 P.3d at 768 (quoting *Cooper,* ¶ 19, 319 P.3d at 920).  We "'invoke[] a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable judgment.  [T]he paramount determination is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance.'"  *Winters v. State,* 2019 WY 76, ¶ 12, 446 P.3d 191, 199 (Wyo. 2019) (quoting *Schreibvogel v. State,* 2010 WY 45, ¶ 47, 228 P.3d 874, 889 (Wyo. 2010)).  To perform adequately "'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'"  *Keats v. State,* 2005 WY 81, ¶ 20, 115 P.3d 1110, 1118 (Wyo. 2005) (emphasis omitted) (quoting *Asch v. State,* 2003 WY 18, ¶ 40, 62 P.3d 945,

958 (Wyo. 2003), and *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066) (some quotation marks omitted).

[¶19]   Mr. Mills claims his trial counsel[1] were ineffective because they failed to:  1) secure Facebook and text messages between him and the victims; 2) present a "complete" record of the utilities at his Gillette residence; and 3) present photographic evidence showing the paint colors of his Gillette house in 2014 and 2016.[2]  We address each of his claims in turn.

### 1.     *Failure to Secure Exculpatory Evidence*

[¶20]   Mr. Mills argues his trial counsel were ineffective because they failed to obtain the Facebook and text messages discussed above.  He claims the messages would have shown A.S.'s testimony about the timeline of the sexual abuse was incorrect and she was at least 17 years old when they had sexual relations, which would have exculpated him of third-degree sexual abuse of a minor.  He also asserts the Facebook and text messages between him and the victims could have been used to undermine the victims' credibility.

[¶21]   Mr. Mills did not file a motion for a new trial in the district court claiming he received ineffective assistance of counsel under Wyoming Rule of Appellate Procedure (W.R.A.P.) 21.  Although "[a] Rule 21 motion is not mandatory and an evidentiary hearing before the district court is not required for an appellant to raise ineffective assistance claims on appeal to this Court," the appellant bears the burden of providing a record to support his claim of ineffective assistance of counsel.  *Pickering v. State,* 2020 WY 66, ¶¶ 54-56, 464 P.3d 236, 255 (Wyo. 2020) (other citations omitted).

[¶22]   In *Shipman v. State,* 2001 WY 11, ¶ 7, 17 P.3d 34, 36 (Wyo. 2001), the appellant claimed his trial counsel performed deficiently by failing to investigate certain witnesses and evidence, failing to request discovery from the State regarding the qualifications of its mental health examiner, and failing to have physical evidence tested by an independent examiner.  We rejected the appellant's claim because he did not provide us with the information he claimed defense counsel should have obtained in his investigation or explain what the missing evidence would have shown.  *Id.*, ¶¶ 10-14, 17 P.3d at 37.

[¶23]   Like in *Shipman,* the Facebook and text messages between Mr. Mills and the victims are not included in the record, and Mr. Mills has presented no evidence of the specific contents and/or dates of the messages.  Without that crucial information, we do not know

---

[1] Mr. Mills was represented by different attorneys at various times throughout the case.

[2] Mr. Mills stated in the heading of his argument on this issue that trial counsel was also ineffective for failing to object to the admission of a video of his statement to law enforcement and failing to present an effective theory of defense.  However, he does not provide any analysis of these statements.  We refuse to consider issues unsupported by cogent argument or citation to pertinent authority.  *Best v. State,* 2022 WY 25, ¶ 9, 503 P.3d 641, 644 (Wyo. 2022) (citing *Pier v. State,* 2019 WY 3, ¶ 26, 432 P.3d 890, 898 (Wyo. 2019)).

whether the messages would have supported Mr. Mills' defense. Thus, Mr. Mills failed to demonstrate counsel performed deficiently by failing to secure the messages or the absence of the evidence prejudiced his defense.

### 2. Failure to Investigate and Present Additional Evidence of Mr. Mills' Utility Records

[¶24] A.S. was born in October 1998 and turned 17 years old in 2015. The State alleged Mr. Mills sexually abused her in 2013 and 2014, when she was between 14 and 16 years old. Mr. Mills admitted he had sex with A.S. but insisted he "waited" until she was 17 years of age or older. Mr. Mills was born in 1976, so he was clearly over 17 years old and four years older than A.S. when he had sex with her. However, if Mr. Mills' sexual encounters with A.S. occurred after her birthday in October 2015, she would have been 17 years old and he would not be guilty of third-degree sexual abuse of a minor under § 6-2-316(a)(iv).

[¶25] Mr. Mills asserts counsel should have done more to establish he did not have sex with A.S. in 2013 or 2014. He claims they should have submitted additional evidence about when and where he lived during those times to contradict A.S.'s testimony about the dates of the sexual encounters. With regard to the 2013 incident at the motel in Gillette, Mr. Mills insists his counsel should have provided "complete" utility records for the house he purchased in Gillette in 2014 to show he did not live in Gillette in 2013.

[¶26] Mr. Mills' father testified at trial that Mr. Mills lived in Vernal, Utah, at the beginning of 2013 and moved to Cheyenne later that year. Mr. Mills purchased a house in Gillette in June 2014 and moved in the following month. To show the dates he lived in Gillette, Mr. Mills called a City of Gillette employee to testify about the records of the utilities at his residence. The records were admitted into evidence as Defense Exhibits A1-A8. The records covered the dates: April 1998 through May 2010 (Exh. A1); September through October 2012 (Exh. A2); December 2012 through July 2013 (Exh. A3); July 2013 through April 2014 (Exh. A4); June 3-4, 2014 (Exh. A5); June 5, 2014, through October 2020 (Exh. A6); December 2020 through May 2021 (Exh. A7); and May 2021 onward (Exh. A8). The records showed who was paying the utilities at the property and his or her relation to the property as either "owner" or "customer." The city employee testified persons designated as "customers" in the records were renters and the gaps in the record dates meant the utilities were "shut off."

[¶27] During 2013, the utilities were paid by renters unrelated to this case. The utility evidence was, therefore, consistent with Mr. Mills' defense that he did not live in Gillette in 2013 when A.S. said he abused her at the motel. There is nothing indicating that additional utility records for 2013 existed or, if they did, that they would have improved Mr. Mills' defense to the charges. Thus, Mr. Mills has failed to show his counsel performed deficiently by failing to further investigate the 2013 history of the utilities at the property

or provide additional records as evidence at trial. Furthermore, Mr. Mills has not shown he was prejudiced by counsel's failure to provide additional evidence of the 2013 utility records. The fact that Mr. Mills did not live in Gillette in 2013 does not mean he could not have visited Gillette at that time, which is consistent with A.S.'s testimony that Mr. Mills was also staying at the motel when he sexually abused her.

[¶28] With regard to the 2014 utility records and how they relate to the charges against Mr. Mills for sexually abusing A.S. that summer, Exhibit A4 showed a renter held the utility account until April 30, 2014. There was a gap in the utility records from April 30 until June 3, 2014, the date "Century 21 Real Estate Assoc" took over the account as "owner" for one day as shown on Exhibit A5. Exhibit A6 showed Mr. Mills listed as the "owner" of the property from June 5, 2014, through October 2020.

[¶29] Mr. Mills claims his counsel performed deficiently by failing to introduce the "complete" utility records. He directs us to the prosecutor's questioning of the city employee on cross-examination about the page numbers at the bottom of the exhibits which showed that each page was a certain number "of 8," e.g., "1 of 8" or "2 of 8." The employee admitted the page numbers did not chronologically follow the records and could not explain why that was so. For example, page 1 of 8 covers the earliest dates, April 1998 – May 2010, and is designated as Exhibit A1, but page 2 of 8 jumps ahead to June 3-4, 2014, and is designated as Exhibit A5. Although the pages are chronologically out of order, there is no indication the records were "incomplete"; all eight pages are included as Exhibits A1 through A8. The city employee explained the gaps in the dates indicated the utilities were "shut off" during those times. Mr. Mills has not shown the utilities were activated and being paid by someone during the gaps in the dates of the records or what relevance such evidence (if it exists) would have had to his defense.

[¶30] In *Rhodes v. State,* 2015 WY 60, ¶ 32, 348 P.3d 404, 415 (Wyo. 2015), the appellant claimed his counsel was ineffective for failing to locate taped recordings of the victim's mother "'begging [him] not to mention that her daughter tried to kill [him],' and stating that the victim had 'twisted the story to get what she wants.'" He asserted the "alleged recordings would have aided his defense" by showing "the victim and [her mother] gave false testimony." *Id.* However, there was no evidence in the court record indicating the tape-recordings existed. *Id.* We were "unable to determine" from the court record that defense counsel "failed to investigate the alleged tape recordings, or that the decision not to introduce them, if they did in fact exist, constituted deficient performance" by counsel. *Id.*

[¶31] Mr. Mills failed to show his attorneys performed deficiently. As in *Rhodes,* there is no indication in the court record that the supposedly "missing" utility records exist and we are unable to determine from the court record whether counsel failed to fully investigate the utility records. Furthermore, Mr. Mills has not demonstrated he was prejudiced by the absence of any such records. Exhibit A6 showed Mr. Mills was the owner of the property

8

beginning in June 2014 and continuing through September 2014, which is the time when he was accused of sexually abusing A.S. at the car wash and in his house. He does not dispute the accuracy of the record showing his ownership during that period and fails to show how additional utility records would have benefited his defense.

### 3. *Failure to Present Photographs of Mr. Mills' House*

[¶32] A.S. testified at trial that in 2014, when she was 15 or 16 years old, Mr. Mills took her to his house in Gillette and sexually abused her. She said the house was painted brown at the time. The State presented a photograph of Mr. Mills' brown house as evidence at trial, and A.S. confirmed the photograph showed the location of the offenses. However, Mr. Mills' father testified the house was white in 2014 when Mr. Mills moved in and was not painted brown until 2016. If the sexual encounter between A.S. and Mr. Mills at his house occurred in 2016 instead of 2014, A.S. would have been over the age of 17 and Mr. Mills would not be guilty of third-degree sexual abuse of a minor. Mr. Mills claims trial counsel's performance was deficient for failing to submit photographs showing the color of his house in 2014 or that he painted it brown in 2016.

[¶33] Mr. Mills' argument relies upon the existence of photographs of Mr. Mills' house before it was painted brown. Similar to the "missing" utility records discussed above, there is no evidence in the record that any such photographic evidence exists. Without such proof, Mr. Mills has not shown his counsel performed deficiently or his defense was prejudiced by the failure to present the evidence at trial.

### C. *Sufficiency of the Evidence – First-Degree Sexual Assault*

[¶34] Mr. Mills asserts the State did not present sufficient evidence at trial to support his convictions for first-degree sexual assault against T.S. When reviewing a claim the evidence was insufficient to support a jury's verdict in a criminal trial, we determine "whether the evidence could reasonably support the jury's verdict." *Huckins v. State,* 2020 WY 21, ¶ 10, 457 P.3d 1277, 1279 (Wyo. 2020) (citing *Thompson v. State,* 2018 WY 3, ¶ 14, 408 P.3d 756, 760 (Wyo. 2018), and *Mraz v. State,* 2016 WY 85, ¶ 19, 378 P.3d 280, 286 (Wyo. 2016)). "We do not reweigh the evidence or reexamine the credibility of the witnesses." *Id.* Instead, we consider "'the evidence in the light most favorable to the State. We accept all evidence favorable to the State as true and give the State's evidence every favorable inference which can reasonably and fairly be drawn from it.'" *Thompson,* ¶ 14, 408 P.3d at 761 (quoting *Worley,* ¶ 17, 386 P.3d at 771) (other citations omitted). We "'disregard any evidence favorable to the appellant that conflicts with the State's evidence.'" *Harnden v. State,* 2016 WY 92, ¶ 5, 378 P.3d 611, 613 (Wyo. 2016) (quoting *Pena v. State*, 2015 WY 149, ¶ 16, 361 P.3d 862, 866 (Wyo. 2015)).

[¶35] Mr. Mills was convicted of three counts of first-degree sexual assault against T.S. under Wyo. Stat. Ann. § 6-2-302(a)(i) (LexisNexis 2021). That provision states: "Any

actor who inflicts sexual intrusion on a victim commits a sexual assault in the first degree if . . . [he] causes submission of the victim through the actual application, reasonably calculated to cause submission of the victim, of physical force or forcible confinement[.]" *Id.* The State alleged Mr. Mills inflicted sexual intrusion on T.S. through cunnilingus, digital penetration of her vagina, and sexual intercourse, all while in his white truck parked at the Shell Food Mart. In each charge, the State asserted Mr. Mills committed the sexual intrusion while applying physical force reasonably calculated to cause T.S.'s submission.

[¶36] T.S. testified that, in 2015, Mr. Mills arranged through Facebook to meet her at the Shell Food Mart in Gillette. After driving to the store, she willingly got into his white truck and rode around Gillette with him. When they returned to the Shell parking lot to allow T.S. to pick up her car, Mr. Mills asked her to have sex with him. She refused, and he held her down, removed her jeans, performed cunnilingus upon her, and penetrated her vagina with his fingers and penis. The jury heard a recording of Mr. Mills' interview with the case investigator where he admitted he had engaged in sexual acts with T.S. in his truck near the Shell station. The State also presented evidence showing Mr. Mills owned a white truck when the alleged assaults took place.

[¶37] On cross-examination, the defense attempted to undermine T.S.'s testimony by using a photograph introduced by the State as Exhibit 2 to show Mr. Mills parked in the middle of the Shell parking lot, which was illuminated at night. The defense also tried to establish T.S consented to the sexual encounters with evidence that, on other occasions, T.S. had agreed to engage in various sex acts with Mr. Mills.

> [T]he question of credibility of witnesses rests with the trier of fact, *Montez v. State*, Wyo., 527 P.2d 1330, 1332 ([Wyo.] 1974); *Janski v. State*, Wyo., 538 P.2d 271, 277 ([Wyo.] 1975), and this determination will not be disturbed on appeal. *Brown v. State*, Wyo., 581 P.2d 189, 191 ([Wyo.] 1978). There is no rule of law that we are aware of that says that a fact finder must believe or disbelieve anyone. *In fact, the trier of fact is free to accept all, part or none of the evidence offered by a witness. Hopkinson v. State*, Wyo., 632 P.2d 79, 148 ([Wyo.] 1981), *cert. denied* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982); *Clegg v. State*, Wyo., 655 P.2d 1240, 1242 ([Wyo.] 1982).

*King v. State,* 2023 WY 36, ¶ 13, 527 P.3d 1229, 1237 (Wyo. 2023) (quoting *Simmons v. State*, 687 P.2d 255, 258 (Wyo. 1984)) (emphasis added).

[¶38] The State brought fourteen counts against Mr. Mills for sexually assaulting T.S., but the jury only convicted him of the three counts at the Shell Food Mart. It was within the jury's province to accept T.S.'s testimony that Mr. Mills sexually assaulted her without her

consent in the generally well-lit Shell Food Mart parking lot, even though it did not accept the State's evidence on the other counts. When we apply our standard of review which requires us to give every favorable inference to the State's evidence, we have no difficulty affirming Mr. Mills' convictions for first-degree sexual assault against T.S.

## CONCLUSION

[¶39] Mr. Mills failed to demonstrate the State suppressed potentially exculpatory messages between him and the two victims. He also failed to establish defense counsel provided ineffective assistance by not securing the messages between him and the victims or presenting additional evidence at trial of the records of the utilities at his home in Gillette or photographs of the house's paint colors. The State presented sufficient evidence that Mr. Mills committed first-degree sexual assault against T.S.

[¶40]   Affirmed.

11